# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2362-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LUIS A. MASSA, a/k/a
LOUIS MASSA,

     Defendant-Appellant.

_____

       Argued October 7, 2020 – Decided November 4, 2021

       Before Judges Ostrer, Accurso and Enright.

       On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 13-10-3149.

       Peter T. Blum, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Peter T. Blum, of counsel and on the briefs).

       Kevin J. Hein, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Jill S. Mayer, Acting Camden County Prosecutor, attorney; Kevin J. Hein, of counsel and on the brief).

The opinion of the court was delivered by

OSTRER, P.J.A.D.

After two jury trials — the second necessitated by a partial verdict in the first — defendant Luis A. Massa, then a pastor, was convicted of multiple acts of aggravated sexual assault, sexual assault, and criminal sexual contact against a female congregant K.V. ("Karen") when she was thirteen to sixteen years old. Massa was also found guilty of endangering Karen's welfare and that of another young female parishioner, C.R. ("Carla").[1]

Massa principally contends the trial court should have excluded his stationhouse statement from the first trial and excluded testimony on Child Sexual Abuse Accommodation Syndrome ("CSAAS") from both trials. As for the first point, we conclude that police interrogators' false assurances about Massa's potential criminal liability rendered a large part of his confession involuntary. Because of the confession's importance, admitting it into evidence was plain error. Therefore, Massa is entitled to a new trial of the affected counts. As for the second point, which we need address only as to the second trial, we conclude that the admission of the CSAAS testimony was error, but not plain

---

[1] We use pseudonyms of the victims and their families and friends to protect the victims' privacy.

A-2362-17

error. Because Massa's additional points challenging his convictions lack merit, we do not disturb the second trial's verdict. We also reject Massa's contention that the court wrongfully double-counted aggravating factors in his sentence. Therefore, we affirm in part and reverse in part.

I.

We begin with the following brief overview of the State's case and will discuss additional pertinent facts when we address each legal issue.

Massa was the pastor of a small congregation in Camden. Karen attended services and activities at the church almost daily. Massa agreed to make her leader of the church youth group when she was thirteen. Massa assumed a father-like role to Karen, whose own father was not present in her home. He gave her advice, money, and food for her family. He often invited her to sleep over at his house, where he lived with his wife and their informally adopted adult daughter.

Massa was thirty-two years old and Karen was still thirteen in the summer of 2010 when she said Massa first sexually assaulted her in his home by an act of penal-vaginal penetration. He apologized, told her he still loved her as a daughter, and promised not to do it again. But, a short while later, he resumed assaulting her. Over the next three years, he repeatedly assaulted Karen in like

A-2362-17

manner — as many as five times a week — in his home, in his church office, or in the church van. He also performed at least two acts of cunnilingus and an act of digital-vaginal penetration, and he forced her to perform fellatio. Massa also sent sexually charged texts to Karen.

Karen starved herself in response. She explained (at the second trial, only) that she said nothing about the first assault because she took Massa's word he would never do it again and she did not know how to tell anyone. She continued to remain silent because she "was forced into this manipulative, abusive situation" and "didn't know how to get out of it."

When she was sixteen, Karen began dating J.F. ("Josue"), a congregant in his mid-twenties. Although Massa as pastor initially approved of their dating, he later reacted jealously. Karen told Josue about the assaults and showed him sexually charged texts Massa sent. A few months later, Karen disclosed the assaults to her brother N.V. ("Nomar"), who insisted she tell her mother or he would. Karen then told her mother L.V. ("Linda"), who alerted the police.

Karen was not the only young congregant of sexual interest to Massa. He also exchanged sexually charged texts with Carla, then a thirteen- or fourteen-year-old congregant.

A-2362-17

A grand jury returned a fifteen-count indictment against Massa. Three counts pertained to crimes, including most seriously first-degree aggravated sexual assault, committed against Karen before she was fourteen.[2] Five counts pertained to crimes, including first-degree aggravated sexual assault, committed against her when she was fourteen but not yet sixteen.[3] And five counts pertained to crimes, including second-degree sexual assault, committed against her when she was sixteen.[4] The indictment also charged Massa with third-degree

---

[2] These counts included: first-degree aggravated assault against a child at least thirteen but under sixteen involving "vaginal intercourse" by a person with supervisory or disciplinary power, N.J.S.A. 2C:14-2(a)(2)(b) (count one); second-degree sexual assault involving "vaginal intercourse" by physical force or coercion, N.J.S.A. 2C:14-2(c)(1) (count two); and second-degree endangering the welfare of a child by sexual conduct by someone with a legal duty or an assumed responsibility to care for the child, N.J.S.A. 2C:24-4(a) (count three).

[3] These counts included: three counts of first-degree aggravated sexual assault against a child at least thirteen but under sixteen, N.J.S.A. 2C:14-2(a)(2)(b), by a person with supervisory or disciplinary authority, involving "vaginal intercourse" (count four), digital vaginal penetration (count five), and cunnilingus (count six); third-degree aggravated criminal sexual contact involving fondling, N.J.S.A. 2C:14-3(a) (count seven); and second-degree endangering the welfare of a child by someone with a legal duty or an assumed responsibility to care for the child, N.J.S.A. 2C:24-4(a) (count eight).

[4] These counts included: three counts of second-degree sexual assault against a child between sixteen and eighteen, N.J.S.A. 2C:14-2(c)(3)(b), by a person with supervisory or disciplinary authority, involving "vaginal intercourse" (count nine), digital vaginal penetration (count ten), and cunnilingus (count eleven); fourth-degree criminal sexual contact involving fondling, N.J.S.A.

terroristic threats of Josue, N.J.S.A. 2C:12-3(a) (count fourteen), and second-degree endangering Carla's welfare by someone with a legal duty or an assumed responsibility to care for her, N.J.S.A. 2C:24-4(a) (count fifteen).

At the first trial, the State based its case mainly on Karen's and Carla's testimony and Massa's recorded statement. The jury also heard from law enforcement and child protection witnesses, Karen's mother, a CSAAS expert, and a child abuse expert. Massa did not testify and presented three character witnesses. One, the church secretary, testified about Massa's limited English language skills (supporting the defense theme that Massa did not understand his interrogators). Referring to Karen's 2011 formal church membership certificate, the secretary also asserted that Karen was not involved in the church long before that, thus challenging the credibility of Karen's assertion the assaults began in 2010.

The first jury could not reach a verdict on any of the eight counts pertaining to Karen when she was under sixteen. As for the crimes allegedly committed when Karen was sixteen, the jury found Massa guilty of two counts of second-degree sexual assault pertaining to "vaginal intercourse" and digital

---

2C:14-3(b) (count twelve); and second-degree endangering the welfare of a child by someone with a legal duty or an assumed responsibility to care for the child, N.J.S.A. 2C:24-4(a) (count thirteen).

A-2362-17

penetration, N.J.S.A. 2C:14-2(c)(3)(b), and fourth-degree criminal sexual contact involving fondling, N.J.S.A. 2C:14-3(b), but the jury hung on a charge of second-degree sexual assault involving cunnilingus, N.J.S.A. 2C:14-2(c)(3)(b). The jury also found Massa guilty of second-degree endangering the welfare of Carla, N.J.S.A. 2C:24-4(a). The jury acquitted Massa of the terroristic threat charge, and the judge dismissed the count charging second-degree endangering Karen when she was sixteen. The court sentenced Massa to an aggregate seventeen-year term of imprisonment.[5]

At the second trial, the State did not use Massa's recorded statement, but again relied on Karen's testimony. Additionally, Josue testified as a fresh complaint witness and described Massa's reaction to his relationship with Karen. Nomar testified about his sister's disclosure to him, her contacts with Massa, and her demeanor during the years he assaulted her. Evidently anticipating the church secretary's testimony, the prosecutor elicited that Nomar and his sister were involved in the church a year or two before both of them formally became members in August 2011. The same experts and investigators testified. Only the church secretary testified in Massa's defense, again raising questions about

---

[5] The court imposed eight-year terms of imprisonment on counts nine, ten, and fifteen (the first two terms concurrent with each other but consecutive to the third), consecutive to a one-year term on count twelve.

when Karen became involved in the church.  The jury found Massa guilty of all

the counts then remaining.

The court imposed a thirty-five-year term of imprisonment, consecutive

to the seventeen-year term imposed after the first trial.[6]

## II.

Massa raises the following points for our consideration:

> POINT I
>
> THE STATEMENT MUST BE SUPPRESSED BECAUSE THE DEFENDANT'S DIFFICULTIES WITH ENGLISH AND THE DETECTIVE'S MISLEADING EXPLANATIONS RAISE A STRONG DOUBT AS TO WHETHER THE DEFENDANT KNOWINGLY WAIVED HIS MIRANDA RIGHTS. U.S. CONST. AMENDS. V, XIV; N.J. CONST. ART. I, PARAS. 9, 10.
>
> POINT II
>
> THE STATEMENT MUST BE SUPPRESSED BECAUSE IT WAS NOT VOLUNTARY WHERE THE DETECTIVE MADE THE FALSE PROMISE

---

[6] After merging counts two and three into count one, and count eight into count four, the court imposed fourteen-year terms of imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2(a), on counts one, four, five, and six; a four-year term on count seven; and a seven-year term on count eleven.  The court ordered that the sentences on counts four, five, six, and seven run concurrently with each other and consecutively to the count one sentence, which in turn would run consecutively to the count eleven sentence.  The court also directed Massa to comply with Megan's Law requirements on counts one, four, five, six, seven, and eleven.

A-2362-17

THAT MASSA WOULD NOT BE IN TROUBLE FOR CONSENSUAL SEXUAL CONDUCT WITH A SIXTEEN-YEAR-OLD.  U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1.

POINT III

BOTH TRIALS WERE UNFAIR BECAUSE OF THE ADMISSION OF EXPERT TESTIMONY ON CHILD SEX ABUSE ACCOMMODATION SYNDROME TO EXPLAIN COMPLAINANT KV'S DELAYED REPORTING.  U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1 (not raised below).

A. UNDER A RECENT SUPREME COURT CASE, THE ADMISSION OF CSAAS TESTIMONY WAS PLAIN ERROR BECAUSE IT WAS SCIENTIFICALLY UNRELIABLE AND BECAUSE THE PROSECUTOR DID NOT LAY THE FOUNDATION THAT KV'S EXPLANATION FOR THE DELAY WAS BEYOND THE KEN OF THE AVERAGE JUROR.

B. THE RECENT SUPREME COURT CASE SHOULD BE APPLIED HERE BECAUSE THE NEW RULE THAT CSAAS IS UNRELIABLE SHOULD BE GIVEN PIPELINE RETROACTIVITY AND BECAUSE THE OLD RULE THAT THE COMPLAINANT'S EXPLANATION MUST BE BEYOND THE KEN OF THE AVERAGE JUROR IS APPLICABLE WITHOUT RETROACTIVITY ANALYSIS.

POINT IV

THE SECOND TRIAL WAS UNFAIR BECAUSE A DOCTOR'S HEARSAY ACCOUNT OF THE DETAILS OF COMPLAINANT KV'S ACCOUNT OF

SEXUAL ABUSE WENT BEYOND WHAT WAS PERTINENT TO DIAGNOSIS AND TREATMENT. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1[.]

POINT V

THE SECOND TRIAL WAS UNFAIR BECAUSE OF IRRELEVANT AND UNDULY PREJUDICIAL TESTIMONY THAT, AT THE TIME OF MASSA'S ARREST, SOMEONE HAD THROWN A BRICK THROUGH COMPLAINANT KV'S WINDOW AND ONE OF MASSA'S FAMILY MEMBERS HAD THREATENED WITNESS JF. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1.

POINT VI

THE SENTENCING COURT IMPROPERLY DOUBLE-COUNTED IN FINDING AGGRAVATING FACTOR TWO BECAUSE MASSA'S CLOSE PASTOR-PARISHIONER RELATIONSHIP WITH COMPLAINANTS WAS ALSO AN ELEMENT OF THE OFFENSES.

### III.

We begin by addressing Massa's argument that his recorded statement should have been excluded from the first trial. The trial court found that Massa was not in custody; but even if he were, the police properly secured his waiver of his Miranda[7] rights, and Massa gave his statement voluntarily and knowingly.

---

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

Massa challenges each of those three rulings. He raises for the first time on appeal that he involuntarily confessed to crimes against Karen when she was sixteen because the police falsely suggested that unforced sexual contact with a child that age was not criminal.

A.

We apply a "'searching and critical' review of the record to ensure protection of [Massa's] constitutional rights," and we review legal issues de novo. State v. Hreha, 217 N.J. 368, 381-82 (2014) (quoting State v. Pickles, 46 N.J. 542, 577 (1966)). That said, we defer to the trial court's factual findings on the admissibility of Massa's statement unless they "are so clearly mistaken — so wide of the mark — that the interests of justice demand intervention." State v. S.S., 229 N.J. 360, 381 (2017); see also State v. Tillery, 238 N.J. 293, 314 (2019). We also apply a plain error standard to Massa's newly-minted objection to the admissibility of his confession based on police misinformation. See State v. Bey, 112 N.J. 45, 63 (1988) (applying the plain error standard to a new objection to the admissibility of a confession raised on appeal, notwithstanding that the defendant objected to the confession's admissibility on other grounds in the trial court).

Applying that standard of review, we conclude the trial court erred in holding Massa was not in custody, but correctly held that Massa knowingly waived his right to remain silent. However, Massa's confession to sexual assaults and sexual contact when Karen was sixteen was involuntary because police induced those statements by falsely assuring Massa that non-forced sexual contact with a sixteen-year-old was not criminal.

B.

We turn first to the issue of custody. Miranda warnings — including warnings that the suspect "has the right to remain silent" and that anything the suspect says can be used against him or her in court, Miranda, 384 U.S. at 479 — are required only "after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way," State v. Hubbard, 222 N.J. 249, 265-66, 270 (2015) (quoting Miranda, 384 U.S. at 444). The Miranda safeguards are tied to a suspect's custody because "a custodial interrogation by law enforcement officers is inherently coercive," and there is "inherent psychological pressure on a suspect in custody." State v. P.Z., 152 N.J. 86, 102 (1997). The "psychological pressures inherent in a police-dominated atmosphere" are what "might compel a person 'to speak where he [or

she] would not otherwise do so freely.'" State v. L.H., 239 N.J. 22, 41 (2019) (quoting Miranda, 384 U.S. at 467).

"The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." P.Z., 152 N.J. at 103. "Another factor is whether a suspect knew that he or she was a focus of the police investigation." State v. Stott, 171 N.J. 343, 365 (2002). "[C]ustody exists if the action of the interrogating officers and the surrounding circumstances, fairly construed, would reasonably lead a detainee to believe he [or she] could not leave freely." State v. Messino, 378 N.J. Super. 559, 576 (App. Div. 2005) (first alteration in original) (quoting State v. Coburn, 221 N.J. Super. 586, 596 (App. Div. 1987)); see State v. O'Neal, 190 N.J. 601, 615-16 (2007). A suspect may be in custody before police have formally arrested, handcuffed, or physically restrained him or her at the police station. P.Z., 152 N.J. at 103. A significant show of police force may lead a reasonable person to believe he or she was not free to leave. See, e.g., United States v. Borostowski, 775 F.3d 851, 860-61 (7th Cir. 2014).

13

Here, the undisputed facts demonstrate that Massa was in custody. The sole witness at the <u>Miranda</u> hearing, Camden County Prosecutor's Office Detective Michael Rhoads, whom the trial court found credible, testified that he and fellow detective Nicholas Villano approached Massa at his church after 6:00 p.m. the day after Rhoads took a statement from Karen. Rhoads told Massa he "needed to talk to him." Rhoads referred to the allegations made against him, and Massa "seemed to be aware of" them. Rhoads and Villano were accompanied by "uniformed officers just to show a uniform presence" and two other prosecutor's office members. Faced with that show of force, Massa "agreed to be transported" by Rhoads and Villano. They brought him to a small windowless interview room and advised him to sit in the room's back corner. Rhoads and Villano positioned themselves at a table between Massa and the door.

Although he was not arrested, the show of force strongly encouraged him to accede to the detective's request to interview him; he knew he was suspected of serious crimes; he had little opportunity to leave once he travelled to the station house; and he was isolated in a small interrogation room with two officers blocking his exit. Under those circumstances, Massa would reasonably believe he was not free to leave and was subject to the inherent psychological

14

pressures of a custodial interview. See, e.g., Hubbard, 222 N.J. at 271-72 (finding a defendant was in custody when a detective drove him to the police station, brought him to an interrogation room, instructed him to move to a "chair in the corner of the room, farthest from the door," and then sat between him and the door).

In sum, we find Massa was in custody and his Miranda rights attached.

C.

But we reject Massa's argument that he did not knowingly waive his Miranda rights because he has difficulty speaking English and did not understand all of the detectives' words.

Rhoads placed a Miranda rights form in front of Massa and orally advised him that he had the right to remain silent, to consult with an attorney, and to have an attorney present during questioning, and that anything he said could and would "be used against [him] in court or any other proceedings." Rhoads further advised Massa that if he could not afford an attorney, the court would appoint someone to represent him, and that if he decided to answer questions with or without an attorney, he had the right to stop answering at any time or stop the questioning for purposes of consulting one. After each question, Rhoads obtained Massa's oral concurrence that he understood and secured his initials on

the appropriate place on the form. Rhoads also told Massa that if he did not understand anything, he would clarify it for him.

Rhoads hit a snag when he advised Massa that he could "waive" his right to remain silent and "answer questions or make a statement without consulting a lawyer." Massa said he did not understand the word "waive." Rhoads then told Massa, "You'd be — you'd be waiving your rights to talk to us. If you don't want to waive your right to us, you can still say, 'No,' and you won't — you won't want to give us a statement. Do you want to give us a statement?" Massa responded, "What do I want to give a statement for?" Rhoads told him that he wanted to hear Massa's "side of it" pertaining to the allegations. After some more back-and-forth, Rhoads asked, "So you're telling me that you don't want to talk to me?" Massa began to answer, "No . . . ," when Villano broke in to explain, "What . . . we're trying to say to you is that there's an allegation, okay, and, in order for us to speak to you, we had to read you these rights, which you said you do understand, right?" Massa responded, "Okay." Villano continued, "Okay. Now, we ask you after you — we read each of these rights to you and that you do understand them do you want to talk to us?" Massa answered, "Yeah," nodding. Rhoads then confirmed, "Yes?" And Massa answered, "That's

16

fine." Then, Rhoads said, "Okay. Then circle, 'Yes.'" Massa complied and the interrogation followed.

To offer Massa's custodial statement, the State had to prove beyond a reasonable doubt that Massa knowingly, intelligently, and voluntarily waived his right to remain silent. State v. Presha, 163 N.J. 304, 313 (2000). The court had to decide if Massa "understood that he did not have to speak, the consequences of speaking, and that he had the right to counsel before doing so if he wished." State v. A.M., 237 N.J. 384, 397 (2019) (quoting State v. Nyhammer, 197 N.J. 383, 402 (2009)). The court was required to consider "the totality of all the surrounding circumstances," including "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] . . . whether physical punishment or mental exhaustion was involved[, and a] suspect's previous encounters with the law." State v. Miller, 76 N.J. 392, 402 (1978) (citations omitted). Also relevant are "the explicitness of the waiver, language barriers," and any other pertinent factors. Tillery, 238 N.J. at 317 (citation omitted). A waiver need not "be explicitly stated in order to be effective." Id. at 316.

The court found "Massa was able to communicate and speak in English"; "[h]e asked for clarification at times with specific words he may not have understood . . . [and] was provided with clarification"; and the video demonstrated "that there was an understanding between the detectives and Mr. Massa as to what each [question] was referring to" before the questioning proceeded. In particular, the court was satisfied that the detectives adequately addressed Massa's "question as to the meaning of the word, 'waive.'"

There was sufficient evidence in the record to support the court's conclusion. As the Court held in Tillery, a waiver need not be "explicitly stated in order to be effective." 238 N.J. at 316. Yet, the detectives secured an explicit waiver here. We acknowledge that Rhoads misspoke when he told Massa that his waiver pertained to Massa's "rights to talk" to the detectives. The waiver pertained to his right not to talk. But Villano successfully explained the waiver question, stating it referred to whether Massa was willing to speak to the detectives despite knowing he was entitled to refuse. Massa demonstrated his understanding and consented.

Therefore, we shall not disturb the court's finding that Massa knowingly and voluntarily waived his right to remain silent.

## D.

Massa also argues his confession was not voluntary because it was obtained in response to misstatements that Massa would have an "out" if his conduct with Karen was unforced or consensual when she was sixteen. We agree, regarding the confession those misstatements induced.

During the first half-hour of the interrogation, Massa acknowledged that he exchanged sexually charged texts with Karen when she was thirteen, fourteen, and fifteen, but he declined to admit that he had "vaginal intercourse" with her. He asserted that his personal relationship with Karen was confidential because of his role as a pastor.

The detectives then focused on whether the sexual interactions were "consensual." Rhoads told Massa that Karen could lawfully consent to sex at the age of sixteen. "[S]he's sixteen now, she can consent to having sex, okay. Did you guys start having sex when she was sixteen?" After Massa said he did not understand the word "consensual," Rhoads asked, "[W]as it consensual or did you force yourself on her? It's one or the other . . . ."

At first, Massa denied that Karen "wanted to have sex" with him. But after another eight minutes of fruitless questioning, Rhoads said, "If it was consensual, that's what I'm trying to find out. You have to understand, if it was

19

consensual, I'm giving you an out here, man, if it was consensual alright we're all good." Massa repeated that he did not understand "consensual."

Rhoads inquired whether Karen initiated sexual contact, and Massa then said she did, but only when she was sixteen. In the follow-up questioning, Massa admitted that he touched Karen's breasts, Karen touched his penis multiple times, he touched her vagina with his fingers, and he touched her vagina and anus with his penis (although she tried to insert his penis into her vagina, Massa said there was no "penetration"). Massa insisted that Karen initiated all of those interactions and she did so only when she was sixteen.[8]

As we have noted, the State bears the burden to prove beyond a reasonable doubt that Massa's confession was voluntary under the totality of circumstances. A confession will be deemed involuntary if police coerce it by psychological or physical means. L.H., 239 N.J. at 43. "The voluntariness determination weighs the coercive psychological pressures brought to bear on an individual to speak against his [or her] power to resist confessing." Ibid.

---

[8] After Massa confessed to sexual interactions when Karen was sixteen, the detectives tried to elicit confessions regarding Karen when she was fourteen or fifteen. Rhoads said, "If she came on to you man, that's one thing. Alright, we can . . . work that out. But I need you to be honest with me . . . ." Massa continued to deny sexual contacts when Karen was under sixteen.

The police cannot directly promise or imply that a statement will not be used against a suspect because that promise contravenes the Miranda warning. Id. at 44; see also State ex rel. A.S., 203 N.J. 131, 151 (2010) (finding a defendant's statement involuntary in part because the detective's assurances "that answering his questions would show that [the defendant] was a 'good person' and would actually benefit her" contradicted the Miranda warning that anything she stated could be used against her); State v. Puryear, 441 N.J. Super. 280, 298-99 (App. Div. 2015) (affirming the suppression of a statement where police contradicted the Miranda warning by incorrectly instructing that the suspect "could not hurt himself and could only help himself by providing a statement"); State v. Pillar, 359 N.J. Super. 249, 268 (App. Div. 2003) ("A police officer cannot directly contradict, out of one side of his mouth, the Miranda warnings just given out of the other.").

Promises of leniency are also problematic. L.H., 239 N.J. at 44-45. They "have the capacity to overbear a suspect's will and produce unreliable — even false — confessions." Id. at 45. In L.H., the Court held, under the totality of circumstances, that a confession was involuntary where "[t]he detectives undermined the Miranda warning that defendant's words could be used against him by telling him the truth would set him free; they falsely promised help and

counseling as a substitute for jail; and they minimized the seriousness of the offenses under investigation." Id. at 52. Thus, "[a] court may conclude that a defendant's confession was involuntary if interrogating officers extended a promise so enticing as to induce that confession." Hreha, 217 N.J. at 383.

Even more problematic than a promise of leniency or a promise that the police will not use a statement may be a misstatement that certain behavior is not criminal at all. Such misinformation, like promises of leniency and non-use, minimizes the consequences of a confession and prevents the defendant from rationally deciding to confess or not. "[T]hrough promises of non-prosecution, 'the government has made it impossible for the defendant to make a rational choice as to whether to confess . . . in other words[,] . . . to weigh the pros and cons of confessing . . . .'" United States v. Lall, 607 F.3d 1277, 1286 (11th Cir. 2010) (quoting United States v. Rutledge, 900 F.2d 1127, 1129 (7th Cir. 1990)).

But misstatements of the law are even more manipulative than promises of leniency or non-use of a statement. By convincing the suspect what he or she did was not wrong at all, the misstatement of law directly targets and neutralizes a person's natural reluctance to admit wrongdoing.

In a case strikingly similar to ours, an interrogating officer elicited a confession to unlawful sexual activity with minors. Light v. State, 20 So. 3d

22

939, 940 (Fla. Ct. App. 2009). The officer did so after falsely stating that the age for consent was sixteen, when it was eighteen for a suspect, like the defendant, who was twenty-three or older. Id. at 941. The officer also told the suspect that no matter what he said, he would be able to go home that day. Id. at 940. The Florida appellate court held that the officer's misrepresentation of law rendered the suspect's statement involuntary. Id. at 941.

Other misstatements of law have led to similar results. See Baptiste v. State, 179 So. 3d 502, 506-07 (Fla. Ct. App. 2015) (holding an armed robbery confession was involuntary where police misrepresented that if the suspect used a BB gun, he could be charged only with robbery but not armed robbery, and the misrepresentation caused the suspect to admit to a robbery with a BB gun after repeatedly refusing to confess); Commonwealth v. Baye, 967 N.E.2d 1120, 1130 (Mass. 2012) (suppressing a confession to setting fires, one of which caused fatalities, as involuntary based on the totality of circumstances, including the fact that interrogators "mischaracterized the law of murder, felony-murder, and accident, telling [the suspect] that he would not be guilty of murder if he had intended the fire as a prank").

Applying these principles, we are persuaded that the State failed to meet its burden to show that Massa acted voluntarily when he confessed that he

23

fondled Karen's breasts, he digitally penetrated her vagina, and his penis touched her vagina and anus. Massa's interrogators misstated that those actions would not be unlawful if they occurred when Karen was sixteen and if they were "consensual" — meaning, in their words, Massa did not force her. They misstated the law by asserting that a sixteen-year-old can consent "to have sex" with a man of Massa's age and position, and by asserting that if Massa's sexual interactions with Karen were consensual, then he would have "an out." As Rhoads said, "[I]f it was consensual alright we're all good."

Furthermore, we discern no basis to doubt the causal connection between the officers' misstatement of the law and Massa's confession. See Colorado v. Connelly, 479 U.S. 157, 164 (1986) (stating that improper police conduct must be "causally related to the confession" to warrant suppression); L.H., 239 N.J. at 43 (referring to the exclusion of a confession that "is the product of physical or psychological coercion" (emphasis added) (quoting Miller, 76 N.J. at 405)). For over half an hour, Massa refused to admit that he engaged in any sexual contact with Karen, conceding only that he and she communicated by text. Only after the interrogators assured Massa that consensual contact with a sixteen-year-old was lawful did Massa admit to the acts we have already described. But, consistent with the legal boundaries the detectives described, Massa repeatedly

denied that any of those activities occurred when Karen was under sixteen, and he repeatedly described Karen as the initiator.

Therefore, we conclude that the trial court should have excluded Massa's confession regarding his physical sexual contacts with Karen when she was sixteen.

But we discern no basis to exclude Massa's admissions regarding sexually charged texts with Carla. Although Massa made those admissions after the interrogators misstated the law on consent, the detectives' statements had no apparent bearing on Massa's motivation to admit he sent the texts. As with the texts between Massa and Karen, the detectives made it clear to Massa that they were already aware of the texts, and they quoted from them. Evidently, Massa admitted to the texts because they were undeniable. He was not induced to make his admission by an unrelated statement of the law on consent, which pertained to sexual conduct with children sixteen and over.

E.

As we noted, because Massa did not present the misstatement-of-law argument to the trial court, we apply "the more exacting 'plain error' standard of appellate review." Bey, 112 N.J. at 63. We will reverse "only when 'under the circumstances "the error possessed a clear capacity for producing an unjust

25

result," . . . that is, "one sufficient to cause a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached."'" Ibid. (alteration in original) (quoting State v. Czachor, 82 N.J. 392, 402 (1980)); see also State v. Maltese, 222 N.J. 525, 543-44 (2015).

Massa has met that exacting standard here relating to his convictions for second-degree sexual assault in count nine ("vaginal intercourse" against a child between sixteen and eighteen) and count ten (digital vaginal penetration against a child between sixteen and eighteen) and fourth-degree criminal sexual contact in count twelve. As the Court has observed, "No piece of evidence may have greater sway over a jury than a defendant's confession." L.H., 239 N.J. at 27. Notably, the jury was able to reach a unanimous verdict of guilt only pertaining to the acts to which Massa confessed. That included the three counts just mentioned, and count fifteen, based on Massa's texts with Carla. The jury could not reach a verdict on any of the first eight counts, which charged that Massa committed multiple instances of aggravated sexual assault, criminal sexual contact, and endangering the welfare by sexual conduct when Karen was thirteen, fourteen, or fifteen. Not only did Massa's confession not admit those acts; Massa affirmatively denied engaging in sexual contact with Karen when she was under sixteen. The jury also could not reach a verdict on count eleven,

which charged that Massa assaulted Karen by performing cunnilingus. Although the count alleged Karen was sixteen, Massa denied he assaulted Karen in that manner when the detectives asked.

Thus, we have a reasonable doubt that the jury would have convicted Massa of counts nine, ten, and twelve absent the admission of his involuntary confession. We do not reach the same conclusion as to count fifteen because Massa voluntarily made his statements regarding his sexually charged texts to Carla.

F.

Based on the erroneous admission at the first trial of Massa's statements induced by the interrogators' misstatement of law, the convictions on counts nine, ten, and twelve from the first trial are reversed. We need not reach Massa's argument that those convictions should be reversed based on the State's introduction of CSAAS testimony.[9] To the extent not otherwise addressed, Massa's remaining arguments regarding the first trial's convictions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). The

---

[9] Massa does not argue that the admission of the CSAAS testimony is a basis for disturbing the conviction on count fifteen.

conviction on count fifteen, charging that Massa endangered Carla's welfare, is affirmed.

IV.

We next address Massa's argument that the admission of CSAAS testimony at the second trial was plain error, entitling him to a new trial. We address the role of CSAAS testimony at the trial, review the subsequent case law limiting CSAAS testimony, and analyze whether admitting the CSAAS testimony in this case is grounds for reversal.

A.

At the second trial (as she did at the first), Dr. Julie Lippmann testified as an expert in psychology specializing in child sex abuse. She explained she was testifying generally about "sexually abused kids as a class" and not specifically this case. Lippmann said that CSAAS was intended to explain sex abuse victims' behaviors, including their delayed disclosure. She outlined the five CSAAS components: secrecy, which she said was "inherent in . . . the pattern" of abuse; helplessness, noting that a child who is "smaller or lighter or less strong" is "really helpless" to stop the abuse; accommodation, noting the child who cannot stop the abuse "finds a way to accommodate"; delayed disclosure, stating "it makes sense that kids can't come right out and . . . tell chapter and verse of what

happened" and that child victims' disclosures are "often delayed"; and retraction, noting that some kids recant. Lippmann acknowledged that CSAAS was controversial. It was "not a syndrome in terms of . . . psychiatric diagnosis." Rather, it was "just a description of what the experience may be like . . . for children — not every child, but many times."

As Lippmann amplified each of the components, the prosecutor referred to behaviors paralleling those present in this case. Lippmann agreed that an apology by an offender would "play into the secrecy" element; Karen had testified that Massa apologized after the first time he assaulted her. Regarding accommodation, Lippmann agreed that an eating disorder would be "part of that"; Karen testified that she starved herself during the period of time when Massa assaulted her. Lippmann also testified that teenagers "are more likely to tell a peer, a friend"; notably, Karen first told her boyfriend, Josue. Lippmann also said that child victims over a long period of time will typically be unable to provide specific dates and details of the assaults, which was consistent with Karen's testimony.

On cross-examination, Lippmann agreed that the presence of one or more of the behaviors identified in CSAAS "in itself is [not] going to tell you whether a child was abused or not," and it was "not a diagnostic tool to determine whether

29

something happened." Defense counsel also elicited that accommodation may manifest itself in many, often opposite ways; one victim could do poorly in school and another might overachieve; and one victim might overeat and another may not eat. Lippmann explained, "What you have to look at is what's the child experience, what seems to be — to make sense, and put it all together."

In summation, defense counsel challenged the importance of the CSAAS testimony, noting that Lippmann knew nothing of the facts, she admitted CSAAS was not a diagnostic tool, and virtually any behaviors would fit within the CSAAS factors. The defense's theme focused on Karen's credibility. Pointing to her 2011 membership certificate, counsel challenged her allegation that Massa assaulted her in the summer of 2010, before her fourteenth birthday. And counsel emphasized her lack of recall as to when the other assaults occurred. Counsel also critiqued the police investigation, noting that police did not interview anyone from the youth group Karen led or from the congregation as a whole.

In the course of an extensive summation, the prosecutor invoked Lippmann's testimony, asserting that Massa's apology "all fits . . . into line with the secrecy element"; Karen's "helplessness goes hand in hand with somebody who's in an authority position"; and, referring to Karen's coping mechanisms of

"[s]tarving herself, having self-image issues, dating an older man," the prosecutor argued, "It all fits . . . ." So did Karen's delayed disclosure to a peer, her boyfriend.

The trial judge delivered the model charge on CSAAS then in effect. See Model Jury Charges (Criminal), "Child Sexual Abuse Accommodation Syndrome" (rev. May 16, 2011); see also State v. J.L.G., 234 N.J. 265, 286-87 (2018) (quoting the charge). The charge explains that CSAAS "is not a diagnostic device" but that Lippmann's testimony could be "considered as explaining certain behavior of the alleged victim of child sexual abuse," in particular "why a sexually abused child may delay reporting."

## B.

The Supreme Court held in J.L.G. that CSAAS evidence is generally not scientifically reliable and, therefore, not admissible as expert testimony. 234 N.J. at 272. The only exception pertains to testimony about delayed disclosure. Ibid. The Court found a scientific basis for the opinion that child sexual abuse victims commonly delay disclosure. Ibid. However, expert opinion on that phenomenon must satisfy N.J.R.E. 702; specifically, an alleged victim's delayed disclosure must be beyond the average juror's understanding. Ibid. But if an

31

alleged victim can "offer a rational explanation for the delay in disclosing abuse," then expert testimony is unwarranted.  Id. at 305.

In State v. G.E.P., 243 N.J. 362, 388-89 (2020), the Court gave the J.L.G. rule pipeline retroactivity.  As Massa's appeal was pending when the Court decided J.L.G., we therefore are obliged to apply J.L.G. to his case.  And there is no doubt that under J.L.G., Lippmann's testimony was admitted in error.

Lippmann reviewed the four categories of CSAAS that are inadmissible under any circumstances, and the fifth category — delayed disclosure — that is inadmissible when, as here, the victim explained her delay in a way an average juror could understand.  Karen testified she did not disclose Massa's first assault because she "took his word for it that he would never do such a thing and [she] wouldn't know how to tell anybody anyways what had happened."  In explaining why she finally disclosed, she referred to her previous state of mind:  "[M]y mind was stuck in a box, in an innocent ignorant mind set since I was 13.  And, I was forced into this manipulative, abusive situation where I didn't know how to get out of it."  She said her relationship with her boyfriend gave her the impetus to disclose, explaining, "I feel as though God put my ex-boyfriend at the time in my path to be able to remove me from the situation."  She also

explained that she told her mother only after her brother, to whom Karen confided, said he would do so if she did not.

Because the average juror would be able to understand Karen's explanations without the help of an expert, it was error to admit Lippmann's testimony even about delayed disclosure.

## C.

The dispositive question is whether the error was plain error. Because Massa did not object to admitting CSAAS expert testimony at either trial, we apply that "more exacting" standard, Bey, 112 N.J. at 63, and must reverse only if the error is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," G.E.P., 243 N.J. at 389-90 (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).

The Supreme Court has considered five cases in which CSAAS testimony was admitted in error. In three cases — those of R.P., C.P., and C.K. in G.E.P. — the Court held the error required reversal. 243 N.J. at 392-93. In two cases — J.L.G. and the case of G.E.P. in G.E.P — the Court affirmed the convictions. See J.L.G., 234 N.J. at 308; G.E.P., 243 N.J. at 393. The evident key to the Court's analysis is the presence of evidence corroborating the victim's story.

In J.L.G., the State presented corroborating evidence from multiple sources, and the victim recorded an incident of sexual abuse. 234 N.J. at 306. The Court noted, "Explicit and disturbing language captured on the recording — in words defendant admits were his own — graphically confirm the victim's description of an act of sexual abuse by defendant." Ibid. In a monitored phone conversation with the victim, the defendant offered her "money and other items after asking her to retract her accusations." Ibid. Also, a family friend recounted once visiting the family home and finding the "defendant lying on top of the victim, clothed but noticeably erect." Ibid. The defendant did not testify. Id. at 275. The Court held the admission of CSAAS testimony was harmless in view of the corroborating evidence. Id. at 307.

Although G.E.P. challenged the victim's credibility by denying he ever had sexual intercourse with her, G.E.P., 243 N.J. at 390, the State corroborated her allegations in two significant ways. Police seized "straps, clothespins, rubber bands, and [a] bra . . . from G.E.P.'s office [that] matched [the victim's] description of items G.E.P. used on [her]." Ibid. The jury also heard a monitored conversation between G.E.P. and the victim. Ibid. "G.E.P. 'did not admit to any specific sexual activity . . . .'" Ibid. But his responses, which referred to the intensity of his relationship with the victim when she was a child,

34

"were damning, compelling evidence of guilt." Ibid. Although G.E.P. had moved before trial to bar CSAAS testimony, the Court found no "harmful error" because "the admission of CSAAS testimony did not deny G.E.P. 'a fair decision on the merits.'" Ibid. (quoting State v. Mohammed, 226 N.J. 71, 87 (2016)).

By contrast, the Court identified no corroborating evidence in the cases of R.P., C.P., and C.K. to counteract the impact of the CSAAS testimony. Id. at 391-93. None of the defendants testified. State v. G.E.P., 458 N.J. Super. 436, 456, 459, 461 (App. Div. 2019), aff'd in part, rev'd in part, 243 N.J. 362 (2020). In R.P.'s case, the jury heard from the victim and her mother, who recounted the victim's allegations, and the jury saw a video of the victim describing the abuse to investigators. G.E.P., 243 N.J. at 392. Furthermore, R.P.'s credibility was susceptible to challenge because she retracted her statement, told multiple witnesses that her allegations were a lie, and then retracted her retraction. G.E.P., 458 N.J. Super. at 456.

In C.P.'s case, "[t]he State's evidence consisted of [the victim's] testimony, CSAAS expert testimony, and witnesses that repeated [the victim's] allegation." G.E.P., 243 N.J. at 392. The Court declined to "presume" that rebuttal CSAAS testimony from C.P. "cured the error" of admitting CSAAS testimony in the first place. Ibid. We also noted that the jury could not reach a verdict the first time

the State tried C.P., and only in the second trial did the State present CSAAS testimony. G.E.P., 458 N.J. Super. at 459. We held the use of CSAAS testimony supported reversal. Ibid.

In C.K.'s case, the State conceded the prosecution relied solely on the victim's testimony. G.E.P., 243 N.J. at 392. The Court noted there was no physical evidence to corroborate her allegations. Ibid. We also held that reversal was required by the trial court's failure to deliver the then-applicable jury instruction on the proper use of CSAAS testimony. G.E.P., 458 N.J. Super. at 464.

Turning to the evidence in this case, we have no reasonable doubt that the jury would have reached the same verdict without the CSAAS testimony. We come to this conclusion because the State presented substantial circumstantial evidence corroborating Karen's testimony, and, even from a cold record, it is evident that Karen testified compellingly.

Significantly, Massa sent sexually graphic text messages to Karen, describing sexual acts he wanted to perform on her. Although Karen did not preserve the messages — she wiped her phone before giving it to another person — she showed the texts to Josue before doing so. Rhoads spoke to Josue, who

told him that he had seen the text messages.[10]  The messages were strong circumstantial evidence that a sexual relationship existed.

Josue also testified that Massa reacted jealously to Josue's relationship with Karen.  Josue said that Massa gave Karen "[t]he look you give to a woman that looks good."  Massa closely monitored Josue's and Karen's activities.  Josue rejected the notion that Massa was simply monitoring the morals of two members of his congregation.  Josue noted that there were other young couples within the congregation, but Massa did not similarly monitor them.  And after Massa heard that Josue had kissed Karen, Massa went to Josue's house to confront Josue.  Josue testified that Massa was irate.  Massa complained, "You kissed my daughter after I asked you not to."  Massa threatened Josue with physical harm and said he was "losing two church members."

---

[10]  Massa did not object to Josue's hearsay statement, and Josue was not asked directly about the texts.  But Josue's hearsay was evidential. State v. Ingenito, 87 N.J. 204, 224 n.1 (1981) (Schreiber, J., concurring) (stating "hearsay evidence not objected to is evidential").  The non-objection may have been strategic.  At the beginning of the second trial, the State discussed the possibility of presenting that part of Massa's custodial interrogation in which he admitted sending graphic texts to Karen.  The court overruled Massa's objection to the use of those excerpts.  But the State ultimately did not introduce the recording at the second trial.  Perhaps the defense was concerned that objecting to the hearsay would invite the State to introduce Massa's custodial statement.

Karen also testified about the impact of Massa's continual abuse on her emotional well-being. She said, "I was very confused. I even used to starve myself because of the fact that I felt ugly, fat, worthless, useless, not caring about how I felt, not caring about what was being done to me, just to satisfy others." Nomar corroborated Karen's testimony, stating that "[s]he was getting . . . skinny . . . and she was always complaining about her — her weight and saying that she felt she was too fat or too big. . . . [A]t that time she would starve herself." Nomar also said that when she was between the ages of thirteen and sixteen, Karen was often non-communicative and "oddly sometimes crying, sometimes I couldn't figure out why, what was going on." Nomar also confirmed that his sister and Massa were close and that she slept over at Massa's house once or twice a month.

The State's case against Massa was not burdened with a victim who made drastically inconsistent statements, as did the victim in R.P.'s case. We recognize that the jury failed to reach a verdict in a first trial, as in C.P.'s case. But the difference between the first and second trial was not CSAAS testimony. Lippmann testified twice. Rather, the State bolstered its case by calling Josue and Nomar. And the State did not incidentally assist the defense by presenting Massa's recorded denials of sexual contact when Karen was under sixteen. We

A-2362-17

also acknowledge that Lippmann covered all five aspects of CSAAS testimony, and the State drew connections between CSAAS behaviors and the facts of this case. But the defense vigorously argued against relying on CSAAS testimony, and the Court delivered the model jury instruction on CSAAS testimony, unlike in C.K.'s case.

In sum, we conclude that the introduction of CSAAS testimony in Massa's second trial was error, but not plain error.

V.

Massa's remaining challenges to his convictions lack sufficient merit to warrant extended discussion. R. 2:11-3(e)(2).

Massa contends the court erred by allowing the pediatric expert to convey Karen's hearsay statements about the sexual assaults, the first one in particular which caused her pain and bleeding. We review the trial court's evidentiary rulings for an abuse of discretion. State v. Scott, 229 N.J. 469, 479 (2017). We may assume for argument's sake that Karen's hearsay statements, specifically the part identifying Massa as her perpetrator, exceeded what was essential to diagnose and treat her under N.J.R.E. 803(c)(4). See State v. Bowens, 219 N.J. Super. 290, 298-300 (App. Div. 1987) (holding a doctor could not testify that the victim named alleged perpetrators of sexual assault because it was irrelevant

to the treatment of the patient).  But the hearsay was cumulative of Karen's own testimony and caused no harm.  See State v. McBride, 213 N.J. Super. 255, 273 (App. Div. 1986) (holding the portion of a hospital record containing the identity of the alleged perpetrator was inadmissible, but harmless error).

Massa also contends the court erred by allowing Karen to testify (without objection) that someone threw a brick through a window at her family's home, and members of Massa's family threatened Josue and once surrounded his family's home.  We agree that the testimony had slight probative value.  In particular, the threats to Josue were offered only to bolster his credibility by demonstrating his willingness to testify despite danger.  See State v. Johnson, 216 N.J. Super. 588, 611 (App. Div. 1987) (stating "testimony that the witness was afraid may be offered notwithstanding the fact that the attempts to influence the witness'[s] testimony were not committed with the authorization or knowledge of defendant").  But we discern no significant prejudice to Massa, as he was not alleged to have participated in the threatening, the State presented no evidence that Massa directed the threats, and the State did not argue to the jury that the threats were probative of Massa's consciousness of guilt.  Ibid. (stating a defendant's threats "against a witness . . . to induce him not to testify against the accused is admissible" as evidence of consciousness of guilt).

In sum, we affirm the convictions in the second trial.

VI.

Finally, we consider Massa's challenge to the sentences imposed on convictions we have affirmed. Massa argues that his sentences were excessive because the court improperly double-counted his "close pastor-parishioner relationship" with Karen and Carla. We disagree.

In sentencing Massa after the second trial, the court found aggravating factor two, N.J.S.A. 2C:44-1(a)(2) ("gravity and seriousness of harm inflicted," including the victim's vulnerability and incapacity to resist). The judge explained that Massa's role as the religious leader of a youthful parishioner who trusted him "made her more vulnerable to his sexual advances, and substantially less capable of exercising mental resistance." The court noted those circumstances went "well beyond what was necessary to prove each element of each offense." The judge also found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk of reoffending); and nine, N.J.S.A. 2C:44-1(a)(9) (need to deter). The judge found, clearly and convincingly, that those factors substantially outweighed the sole mitigating factor, seven, N.J.S.A. 2C:44-1(b)(7) (lack of prior criminal history). The court had found the same aggravating and mitigating factors in imposing sentence after the first trial.

We review the court's sentence deferentially. "When the aggravating and mitigating factors are identified, supported by competent, credible evidence in the record, and properly balanced, we must affirm the sentence and not second-guess the sentencing court, provided that the sentence does not 'shock the judicial conscience.'" State v. Case, 220 N.J. 49, 65 (2014) (citation omitted) (quoting State v. Roth, 95 N.J. 334, 365 (1984)). A sentencing court may not double-count facts that establish elements of the relevant offense. State v. Fuentes, 217 N.J. 57, 74-75 (2014).

However, "[a] sentencing court may consider 'aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'" Id. at 75 (second alteration in original) (quoting State v. Henry, 418 N.J. Super. 481, 493 (Law Div. 2010)); see also State v. Martin, 235 N.J. Super. 47, 58-59 (App. Div. 1989) (holding that a detained sexual assault victim's psychological frailty made her more vulnerable and did not duplicate the elements of the crime); State v. Taylor, 226 N.J. Super. 441, 453 (App. Div. 1988) (considering a four-year-old sexual assault victim's "extreme youth" was not double-counting where the statute covered victims under thirteen years old).

We recognize that a "supervisory or disciplinary power over the victim," N.J.S.A. 2C:14-2(a)(2)(b), was an element of counts one, four, five, six, seven,

and eleven, and "a legal duty" or an "assumed responsibility" for a child, N.J.S.A. 2C:24-4(a), was an element of count fifteen. But a camp counselor or school teacher could satisfy the statutory elements. Massa's relationship with Karen, which the court cited in finding aggravating factor two, went deeper than the statutory minimum. Massa was a religious and moral leader. And Massa had taken Karen under his wing before preying on her. The court emphasized the "particularly high level of trust" Karen as a young parishioner placed in Massa, which made her particularly vulnerable. Those considerations were not elements of the crimes, but "extreme reaches of the prohibited behavior." Fuentes, 217 N.J. at 75 (quoting Henry, 418 N.J. Super. at 493).

Affirmed in part and reversed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2362-17